## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| JANE DOE,<br><br>                    *Plaintiff*,<br><br>          v.<br><br>THE WASHINGTON UNIVERSITY, a<br>Missouri Benevolent Corporation,<br><br>                    *Defendants*. | Case No.<br><br>**PLAINTIFF REQUESTS A TRIAL<br>BY JURY** |

## COMPLAINT

Plaintiff, Jane Doe ("Plaintiff"), by and through her undersigned counsel, hereby submits her Complaint against The Washington University.  She states and alleges as follows:

## INTRODUCTION

This action concerns an unjust and discriminatory academic disciplinary proceeding carried out by Defendant, The Washington University ("Washington University" or the "University"), and the law school that it operates, the Washington University School in St. Louis School of Law (the "Washington University School of Law" or "School of Law").  The victim of the proceeding, Plaintiff, was enrolled as a first-year law student when her legal education and promising career prospects were derailed as the result of false charges of academic dishonesty.

Plaintiff, who is a third-generation Egyptian-American Muslim, was suspended from the Washington University School of Law after a lengthy, highly contentious disciplinary process that was initiated under dubious circumstances and marred by numerous procedural irregularities.  The disciplinary process was initiated by a professor who had given high marks to Plaintiff's work under the Law School's anonymous grading protocol, only to reverse herself months later and lodge allegations of academic misconduct after learning Plaintiff's true identity, which allowed

the professor to link Plaintiff's work, which the professor had evaluated highly favorably, to Plaintiff the person, toward whom the professor apparently felt less favorably.  The subsequent disciplinary proceeding was premised on extraordinarily thin evidence and was marred by multiple procedural irregularities, yet ultimately resulted in an academic suspension for Plaintiff.

Even more troublingly, the disciplinary proceedings against Plaintiff followed recent, similar academic disciplinary proceedings initiated against other Muslim-American law students at the Washington University School of Law based on similar, and similarly unfounded, allegations.  The prior proceedings against other Muslim-American students were carried out by many of the same professors and administrators responsible for the proceedings against Plaintiff.

Moreover, the proceedings against Plaintiff took place even though similarly situated Caucasian students were not subjected to anywhere near the same level of scrutiny, let alone disciplinary proceedings.  The actions of the Washington University School of Law have cost Plaintiff dearly–in the loss of her education, in the forfeiture of professional opportunities and potential future earnings, in legal fees and other related expenses that Plaintiff had to incur in order to defend her reputation and continue her education, and in the permanent stain that these proceedings have left on Plaintiff's reputation and heretofore exemplary academic record.

Plaintiff therefore brings this action under Title VI of the Civil Rights Act of 1964, as codified at 42 U.S.C. § 2000d, *et seq*., which prohibits discrimination on the basis of race, color, and national origin in programs and activities receiving federal financial assistance, including institutions of higher education.  The circumstances of this case make clear that Plaintiff is a victim of unlawful discrimination in violation of Title VI.  Through this action, Plaintiff seeks redress from Washington University.  She hopes that by doing so, she can begin the long process of

restoring her personal and professional reputation and get her once promising legal career back on track.

## PARTIES, JURISDICTION & VENUE

1.      Plaintiff was at all relevant times a law student at the Washington University School of Law.  She was a first-year law student at the time of the events giving rise to this Complaint and was suspended from Washington University.

2.      Plaintiff is a third-generation Egyptian-American woman who adheres to the Muslim faith.  She obtained a Master of Arts from Stanford University and Bachelor of Science from the University of North Carolina before enrolling in the Washington University School of Law.  Prior to the events giving rise to this Complaint, Plaintiff had accumulated an outstanding academic record and had never been accused of any form of academic misconduct.

3.      Defendant, The Washington University, is a Missouri Benevolent Corporation organized under Chapter 352 of Missouri's Revised Statutes.  At all relevant times, it owned and operated the Washington University in St. Louis and the Washington University School of Law. These entities will be referenced in this Complaint collectively as the "Washington University," "Washington University School of Law" or the "University."

4.      At all relevant times, Washington University acted by and through its employees and/or agents, many of whom are referenced by name in this Complaint.  These individuals were acting in the course and scope of their employment with Washington University throughout the events described in this Complaint.

5.      Subject matter jurisdiction is premised on 28 U.S.C. §§ 1331, 1343, and 1367.

6.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b) because the events, injuries, and violations of rights

alleged herein occurred within the City of St. Louis, which is within this district, and because Defendant operates and conducts business within this district.

7.     Plaintiff has satisfied all conditions precedent to filing this suit, including, but not limited to, exhausting available administrative remedies.  Specifically, Plaintiff timely filed a Complaint with the Missouri Commission on Human Rights on April 16, 2020.  The Commission issued a Right to Sue Letter on January 19, 2021.

## GENERAL ALLEGATIONS

8.     Plaintiff began her legal education at the Washington University School of Law in the fall 2018 as a first-year student.

9.     In the spring 2019 semester, Plaintiff enrolled in Legal Practice II: Advocacy ("LP II"), a mandatory course for first-year law students. The instructor for LP II was Jane Moul, a non-tenured and non-tenure track faculty member, who also was Plaintiff's instructor the prior semester in her Legal Practice I: Objective Analysis and Reasoning ("LP I") course.

10.     Plaintiff earned an A- in LP I.  At the conclusion of the spring 2019 semester, Professor Moul deemed Plaintiff's performance in LP II to be worthy of an A- as well.

11.     The primary and final project for LP II was an open research appellate brief, for which Plaintiff met in-person with Professor Moul to discuss Plaintiff's proposed outline for her final brief, as did all other LP II students.  Plaintiff's outline detailed her thoughts and ideas for her brief, and she received positive feedback from Professor Moul on the outline.  Professor Moul assigned Plaintiff a grade of 89, which was an A-, on her final brief through the University's anonymous grading protocol.

12.     Under Washington University's grading protocol, professors receive and evaluate students' work anonymously; students are identified to professors only by number, not by name.

Plaintiff was thus identified to Professor Moul as "Student No. 6127" while Professor Moul was evaluating Plaintiff's work.

13.     On June 12, 2019, the same date on which Professor Moul posted Plaintiff's final grade in LP II, Plaintiff sent Professor Moul an email expressing how "very appreciative" she was of the training she received from the instructor's LP courses.   Plaintiff also complimented Professor Moul on how pertinent her educational experience in the LP courses was proving already in the internship she had begun that summer at the North Carolina Attorney General's Office.

14.     In response to Plaintiff's email, Professor Moul emailed Plaintiff that same day to thank her for "making [her] day" and to convey how "lucky" the North Carolina Attorney General's Office was to have her as an intern.

15.     Later in the evening on June 12, Plaintiff replied to Professor Moul's message to inquire "how close [she] was to receiving an A this semester," as she had gotten "high grades throughout LP this semester on the briefs."

16.     What followed this seemingly innocuous email exchange shocked and dismayed Plaintiff.   Now armed with the knowledge of Plaintiff's identity and the anonymous grading number (No. 6127) that was attached to her open brief, Professor Moul contacted Associate Dean Elizabeth Walsh on June 14 to accuse Plaintiff of "suspected misconduct."

17.     To support this accusation, Professor Moul furnished a carefully curated comparison of select excerpts from Plaintiff's final brief and the final brief of another student, who will not be named in this Complaint to protect her privacy and who will instead be designated by her anonymous grading moniker, "Student No. 6298."   According to Professor Moul, these passages–which she produced only after the grade for the brief and, indeed, the final course grade

had already been determined and posted–were so similar that they could be explained only by some type of unethical conduct.

18.     Curiously, although Professor Moul already had identified Plaintiff to Dean Walsh, in a subsequent email dated June 20, 2019, in which she formalized her complaint of "suspected misconduct," Professor Moul made no reference to Plaintiff as such, instead referring to her as "student 6127"–as if she were reporting an anonymous grading number she had not yet identified.

19.     Professor Moul's decision to report this concern came more than two and a half months after Plaintiff and the other students in LP II had anonymously submitted their final briefs. During this more than two-month period (and indeed throughout the entirety of both of Plaintiff's LP courses), Professor Moul: (1) made no reports about any suspected unethical conduct involving either Plaintiff or Student No. 6298; (2) communicated no information to give either Plaintiff or Student No. 6298 any reason to believe they were under suspicion for unethical conduct; and (3) without any delay or impediment, issued passing grades to both Plaintiff and Student No. 6298 on their briefs and on their overall performance in LP II.  It was only in hindsight–after Plaintiff had identified herself in the June 12 email–that Professor Moul recalled to Dean Walsh "a paper" that gave her a "vague sense" that she had "encountered some things in it that were a little quirky at some point before."

20.     Professor Moul could have investigated the matter before Plaintiff contacted her– and indeed, as University faculty, she *should* have investigated what she believed might be unethical conduct–but she opted not to.  By Professor Moul's own admission, such investigation was not warranted because she "wasn't certain" there was, in fact, any impropriety and she "didn't have the time (or, frankly, the stomach) to look into whether there was anything to that feeling within the other class papers . . . ."  Thus, she "moved on."

21.     Unfortunately, Plaintiff could not "move on" so quickly.  Following a telephone call about the accusation with Professor Moul and Dean Walsh on June 18, 2019, Plaintiff received an email from Dean Walsh on June 21 notifying her about a "complaint alleging possible misconduct under the Honor Code [that] was brought against [her.]"  More specifically, the complaint asserted that Plaintiff "possibly cheated" on the final brief, as it was "remarkably similar to the brief written by another student . . . ."

22.     Dean Walsh indicated that she would review the complaint further and that, if she believed there was a "possible violation," she would refer the matter to an Investigative Team charged with conducting further investigation in accordance with the University's Honor Code.

23.     On July 3, 2019, after concluding that there was such a "possibility," Dean Walsh forwarded the complaint to the Investigative Team.

24.     With her summer plans thus upended–and her future uncertain–Plaintiff abruptly shifted her focus to exonerating herself.  After receiving the notice of Professor Moul's complaint from Dean Walsh, Plaintiff consulted Professor Kimberly Norwood, another University faculty member.

25.     Professor Norwood shared with Plaintiff that she had emailed Dean Walsh stating she was "inclined to encourage [Plaintiff] to hire a lawyer sooner rather than later" and including a damning assessment of the University's investigatory process.  Among the points that Professor Norwood raised were the following:

> --Why does our system allow professors to challenge student works months after the work product has been turned in and graded?
>
> --Why are professors allowed to make decisions to charge someone only after they learn the person's identity?  Think of this: *Moul admits on the recording that she wasn't even going to pursue until she learned the student's name.  Really?  And why is that?  That doesn't smell right.  You know this.*

26.     Professor Norwood also revealed to Plaintiff that, just one semester earlier, two other female Muslim-American law students of Arab and Pakistani heritage at the University were accused of impermissible collaboration on a writing assignment.   As in Plaintiff's case, the accusations against these other female Muslim students surfaced only after their identities were made known to a professor.

27.     Notably, Professor Moul had been a member of the Investigative Team that insisted on filing charges against both of those students.  Although the charges were later dropped before a hearing occurred, the experience of being under Professor Moul and her fellow investigators' scrutiny was unnerving and left a lasting impression on the students.

28.     As Professor Norwood said in her June 27, 2019, email to Dean Walsh:

> I do not want to happen to [Plaintiff] what happened to my students from last spring.  Recall they ultimately 'won' but at a serious emotional cost and toll on them . . . .  This was a gross injustice to them.  I don't want to see [Plaintiff] go down this same road.

29.     One of the students from that incident later contacted Dean Walsh by email dated August 6, 2019, to comment on the striking similarities between her case and Plaintiff's.   The student stated the following:

> I simply cannot believe that yet another false allegation against a Wash U Law student has been allowed to continue in this biased and blatantly unfair system.  I wish I could say that I was surprised to hear that the allegation came from Jane Moul–a professor who openly and aggressively pursued the case against [redacted] and I (basing her questions in the investigative interview on something as mundane as the use of dashes and "Century" font).

30.     The next day, Dean Walsh responded by email that she "underst[ood] and appreciate[d] [her] concerns."  She added: "Thoroughly examining and evaluating the Honor Code is one of my top priorities for the upcoming academic year."

31.     The systemic problems with the University's investigatory and disciplinary system that Plaintiff was uncovering soon became even more pressing in her own case.  Under Section III(D) of the Honor Code, the Investigative Team had ten (10) days from the date of receiving a referral from Dean Walsh to decide whether or not to proceed with charges of an Honor Code violation against Plaintiff and then five (5) days from the date of that decision to prepare and deliver a formal charging document.

32.     Yet, it was not until July 30–almost a month after Dean Walsh referred Professor Moul's complaint to the Investigative Team–that Plaintiff received notice via email that the Investigative Team intended to move forward in charging her with an Honor Code violation.

33.     This delay caused significant prejudice to Plaintiff because it gave the Investigative Team a significant time advantage that it could use to "build" a case against her.  The University's delay also extended the process further into the summer, creating greater uncertainty for Plaintiff regarding her plans to return to St. Louis to continue her second-year law school studies during the 2019-2020 school year.

34.     Worse still, the Investigative Team refused to give Plaintiff any explanation as to why, by their own acknowledgment, the investigators would not be able to meet the timelines they were required to meet pursuant to the procedures contained in the Honor Code.

35.     While Plaintiff testified in person to the Investigative Committee, Student No. 6298 only submitted a brief email statement and never was interviewed by the Investigative Committee by telephone or in person.  Following her submission of a brief email statement, the charges were immediately dropped against Student No. 6298.

36.     Furthermore, Professor Hubertz, the faculty advisor to the Investigative Committee, testified at the hearing that she *did not know of or read the charges* against Plaintiff, but merely signed off.

37.     Plaintiff's counsel made a motion to dismiss based on these procedural irregularities, but the motion was denied.  Again, this was another transgression and violation of the procedures and Plaintiff's rights.

38.     One of the investigators (and later prosecutors), Kyle Summerville, had a conflict of interest, which manifested when he expressed his opinions about Professor Moul and LP II in a manner suggestive that Plaintiff had a much different experience in the course than his own.

39.     With each passing day of uncertainty whether she would be prosecuted, Plaintiff and her family suffered significant anxiety and emotional distress.

40.     A week after its untimely determination to press charges, the Investigative Team finally issued a charging document against Plaintiff, alleging she committed acts of cheating and actionable plagiarism under Sections I(A) and I(E)(1) of the Honor Code.

41.     Section III(D)(2)(b)(1) requires a charging document to detail the "specific acts or omissions constituting the alleged violation(s)," but specificity was glaringly absent from the charging document against Plaintiff.  Instead, the document cited a one-week period–sometime "between March 31 and April 7"–during which it merely "appear[ed]" that Plaintiff "had access" to Student No. 6298's brief.

42.     From these loose purported findings, the charging document then made the leap that Plaintiff "substantially copied a portion of [Student No. 6298's] draft onto her own brief, and on April 7 turned it in claiming it to be her own."

43.     The underlying support for these conclusions was not true or accurate.   The charging document noted that Plaintiff's brief gave Professor Moul "pause" during her initial review but that the professor determined Plaintiff deserved the "benefit of the doubt"–until, that is, Professor Moul learned Plaintiff's identity, at which point she "felt" differently.

44.     With the University's case against Plaintiff now ripened into an adjudicatory proceeding, a Hearing Panel convened to rule on the charges, which were litigated by the same student members of the Investigative Team–now dubbed the "Case Presentation Team."  Through her legal counsel, Plaintiff filed several pre-hearing motions, including:

a.      A motion to dismiss the charges on multiple grounds, including the Investigative Team's non-compliance with the 10-day charging determination requirement and other specified timelines, and the defectiveness of the charging document;

b.      A motion to exclude Professor Moul from testifying on the ground that her testimony would not be probative of the actual charges against Plaintiff;

c.      A motion to exclude hearsay statements from several non-testifying witnesses;

d.      A motion to dismiss the charges on the ground that Plaintiff had been significantly prejudiced by the deprivation of her right to compel witness testimony from a fellow student who could offer exculpatory evidence to negate the Investigative Team's charges; and

e.      Yet another motion to dismiss, following the revelation that the Case Presentation Team had furnished prejudicial *ex parte* evidence to the Hearing Panel a day before the hearing–namely, an email from Professor Norwood opining that Plaintiff was

guilty of the charges, in a sudden about-face from the apparently supportive and empathetic display she had shown earlier to Plaintiff.

45.     Collectively, these motions made it abundantly clear that the University's entire case against Plaintiff was premised on a mountain of procedural and substantive defects.

46.     Nevertheless, the Hearing Panel denied each motion.  In a remarkable contrast that further illustrated how stilted the proceeding against Plaintiff was, the Hearing Panel *did* grant an untimely motion *in limine* filed by the Case Presentation Team.  As a result, Plaintiff was denied the right to elicit any evidence about the two female Muslim students against whom Honor Code charges had been filed previously.

47.     On September 20, 2019, the hearing finally commenced.  After an approximately 17-hour proceeding that attracted hundreds of attendees, the Case Presentation Team proved nothing that was not already known.  Even with testimony from the two most critical witnesses in the case–Professor Moul and Student No. 6298–the Case Presentation Team presented no evidence whatsoever of any actual *act* constituting cheating or actionable plagiarism, let alone that Plaintiff was the responsible *actor* or that she had the requisite intent to commit such act.  Under a clear and convincing evidentiary standard, as was applicable under Section IV(B)(2)(d) of the Honor Code, the Case Presentation Team failed to carry its burden of proof.

48.     By contrast, although Plaintiff bore no burden of proof, she put forward multiple witnesses, including herself, whose collective testimony cast further doubt that Plaintiff in any way perpetrated acts of cheating or plagiarism.  Rather, Plaintiff's witnesses cast significant doubt that Plaintiff's and Student No. 6298's respective briefs were as different from other students' briefs as Professor Moul insisted.

49.     Despite the dearth of anything but the barest of circumstantial evidence, or the repeated procedural shortcomings that had marred the investigation and hearing, the Hearing Panel still managed to find in its October 28, 2019 Decision on the Merits–with "abiding conviction," no less–that Plaintiff "copied material from Student No. 6298's draft brief and used it in her open final appellate brief in Legal Profession II."

50.     During the hearing, Professor Moul was asked if she still had the outline presented by Plaintiff during their in-person meeting, which detailed Plaintiff's thoughts and ideas for her brief and on which Professor Moul had given Plaintiff positive feedback.  Professor Moul claimed to have shredded Plaintiff's outline presentation in July 2019, one full month after the initial investigation, despite it being the customary practice for professors to retain such student materials for at least a semester.

51.     Professor Moul also was asked during the hearing if she used plagiarism software in her class.  She replied that she has never used plagiarism software because all the papers would "come back as false positives" because all the students had the same limited number of references. The clear import of Professor Moul's testimony is that all student papers, which were expected to follow a similar format and draw upon a limited amount of source material, would necessarily be similar enough to mislead plagiarism software into concluding that cheating had occurred.

52.     Furthermore, testimony was elicited from four of Plaintiff's classmates and Student No. 6298 indicating that they also had similar passages and citations as Plaintiff and Student No. 6298.

53.     Student No. 6298 also testified that she had no evidence of Plaintiff being alone with her and that Plaintiff did not have access to Student No. 6298's phone, computer or any discarded drafts or copies of Student No. 6298's final paper.   This testimony was further

substantiated by the four other classmates of Plaintiff who also testified that Plaintiff never was alone with Student No. 6298 in a study room.

54.     Having determined that Plaintiff thus was culpable on charges of cheating and actionable plagiarism, the Hearing Panel then turned to the question of what sanction to impose.

55.     In sixteen previous cases involving similar allegations of misconduct, only one student was recommended for suspension.  In that case, Dean Walsh encouraged the student to plead guilty in exchange for lenient judgement.  Dean Walsh and the Hearing Panel subsequently reneged on that agreement and suspended the student.

56.     Unsurprisingly then, although the Hearing Panel had the choice of a wide range of corrective actions–including a reprimand, probation, community service, and others–it opted to recommend the second-most severe punishment after expulsion:  to suspend Plaintiff for at least one semester.  Adding insult to injury, the Hearing Panel also recommended that its findings of Honor Code violations and the resulting suspension be marked in Plaintiff's permanent record thereby ensuring that Plaintiff is forever branded a cheater and plagiarist.

57.     According to the Hearing Panel, these harsh measures were justified by a number of "aggravating" factors.  In particular, the Hearing Panel emphasized Plaintiff's failure to accept "any responsibility for cheating and plagiarizing the work of another student and has not shown any remorse for her actions" and similarly for "blam[ing] others for the charges brought against her . . . ."

58.     Yet, there was a much more obvious and straightforward way for the Hearing Panel to characterize these purported "aggravations:" Plaintiff simply was exercising her rights to challenge her accusers, as she was entitled to do under the Honor Code, and to rebut the flimsy evidence on which the Case Presentation Team's prosecution rested.

59.     In its Decision on Sanctions dated November 19, 2019, the Hearing Panel denied that it was levying a "trial tax" against Plaintiff, claiming instead that the disciplinary actions against her were necessary to deter future reoffending behavior.  More likely, however, the Hearing Panel's actions will deter students in future Honor Code cases from availing themselves of their full due process rights–lest they provoke the University to exact the most stringent penalties at its disposal.

60.     Nevertheless, the Dean of the School of Law, Nancy Staudt, adopted the Hearing Panel's sanction recommendations on November 25, 2019.

61.     Through her counsel, Plaintiff filed a timely appeal of the Hearing Panel's findings and sanctions alleging that she was denied a fair hearing and that the Hearing Panel's sanctions were excessive.  One day before classes began in January 2020, Plaintiff learned that her appeal was denied.

62.     Thus barred from continuing her studies during the spring 2020 semester, Plaintiff was forced to abruptly leave her University housing, abandon her belongings, and forego her University-sponsored health insurance.  Plaintiff subsequently returned home to North Carolina, where she has attempted to rebuild her life and reputation.

63.     Having been denied the most basic tenets of due process during a tribunal at one of the nation's most elite law schools, Plaintiff might expectedly be cynical and suspicious of our legal system.  On the contrary, however, she remains passionate and committed to pursuing a legal career and advocating for justice.  Since her return to North Carolina, Plaintiff has worked as a legal intern at a state government agency and as a summer associate at a prestigious litigation firm. As a testament to her actual work ethic and character–not the false depiction concocted by the University–she received an offer from her law firm for an associate position to commence in the

fall 2021, with a starting salary of $160,000, conditioned upon her completing her law degree by the spring 2021 and passing the bar examination by the fall 2021.

64.    As much as Plaintiff desired to accept the offer, which remained capable of acceptance through October 1, 2020, the University's actions effectively precluded her from doing so.

65.    As a direct result of her suspension, Plaintiff will not be able to complete her legal studies by the spring 2021 and pass the bar examination by the fall 2021.  Thus, Plaintiff was forced to turn down the offer of employment in October 2020.

66.    Unfortunately, this scenario is not likely to be an anomaly but rather a representation of the challenges that will confront Plaintiff repeatedly throughout her burgeoning legal career once prospective employers discover that the University has deemed her a cheater and plagiarist.

67.    Notably, Plaintiff was held to a much, much higher level of scrutiny, and was sanctioned far more harshly, than Student No. 6298, who is a Caucasian student and who was a similarly, if not identically, situated first-year law student.  To wit:

a.    It was only Plaintiff who underwent an interview with the Investigative Team after an initial interview with Dean Walsh and Professor Moul.  By contrast, Student No. 6298 participated in an interview by telephone with Dean Walsh and Professor Moul in which they coached her to use her "imagination" to think about how Plaintiff might have accessed her laptop computer.  Student No. 6298 never participated in any subsequent interview with the Investigative Team and only submitted a brief statement by email.

b.      Similarly, despite her cooperation with the Investigative Team during its investigation, it was only Plaintiff whom the Investigative Team claimed had not been "entirely honest."

c.      The Investigative Team never cast such aspersions on Student No. 6298's character, notwithstanding its admission that Student No. 6298's assertion that she and Plaintiff worked in the same room on the University campus prior to submission of their final brief was "weakly" supported by other students' reports.

d.      And, of course, it was only Plaintiff who ultimately was charged with, found guilty of, and sanctioned for any Honor Code violations; Student No. 6298 was not sanctioned in any way, even though, if misconduct did occur, it was readily inferable from the evidence that Student No. 6298 also was involved.

68.     The discriminatory intent of the University's treatment toward Plaintiff is further evidenced by the way that it treated other students within Plaintiff's protected class; namely, the two female Muslim students who, just a semester earlier, faced similar accusations of unethical conduct in connection with a writing assignment.

69.     Like Plaintiff, these other students faced Honor Code charges only after their identities came to light to a professor.  And, as in Plaintiff's proceeding, Professor Moul played a pivotal role in those cases, as a member of the Investigative Team that decided to file charges against the students.

70.     Without any prompting, one of the two students conveyed this very same point in her August 6, 2019 email to Dean Walsh:

> It is hard not to wonder how in the course of two consecutive semesters three Muslim female students have been falsely accused and aggressively prosecuted against by the Wash U Law administration. Wash U Law has

17

proven to be a hostile and unwelcoming environment to the very few Muslim students on campus–students like Plaintiff, [redacted], and I.

71.    Of course, it was not only the students themselves who were concerned about the University singling out female Muslim students for adverse action.  This concern also was present among the law school faculty, including Professor Norwood, who reported in a voicemail to Plaintiff that the University "had some issues in the past and some of the former students were Muslim and I'm wondering if that has something to do with what's happening here."

72.    Despite these known concerns, the Hearing Panel managed to conclude that there was "no evidence to support [Plaintiff's] contention that she was targeted because of her race or religion or that she was the subject of bias or prejudice in any way."  This conclusion is risible, to put it very mildly, given that the Hearing Panel itself granted the Case Presentation Team's untimely motion *in limine* to preclude any evidence, including testimonial evidence to be elicited from Professor Moul during cross-examination, regarding the incidents with the other two students.

73.    As evidence of further harassment and targeting of Plaintiff by the University, Professor Norwood accosted and threatened Plaintiff on multiple occasions–once behind the law school building and another time in a classroom.  Professor Norwood threatened Plaintiff by stating "she will never allow [Plaintiff] to be a law student at Washington University" and that she (Professor Norwood) will also ruin her Plaintiff's father's career as a professor.

74.    Multiple persons witnessed Professor Norwood's tirade behind the law school building.  Amazingly, Professor Norwood has attempted to contact Plaintiff by telephone numerous times since her suspension was handed down in order to continue the harassment.

75.    After the Sanctions Hearing, Dean Walsh went to Plaintiff's mailbox/locker and threw out her papers and belongings.  This action was also witnessed.

76.     Dean Walsh also went to the locker that Plaintiff maintained in the offices of the legal journal of which she is a member, threw out Plaintiff's belongings, and informed other members of the journal that Plaintiff had been removed from the University and that journal editors should cease all communication with her.

77.     Dean Walsh also contacted Plaintiff's friends and told them to not contact her during the suspension.

78.     All of this harassment and targeting further isolated Plaintiff and rendered her completely unsafe and threatened in the University.

79.     Plaintiff has suffered, and will continue to suffer, substantial ongoing harm as a result of Washington University's conduct.  Such damages include, without limitation:

a.      The tuition and costs that Plaintiff has expended in the expectation of receiving a legal education that would result in her matriculation after the spring 2021 semester;

b.      The costs that Plaintiff has incurred in connection with the Honor Code investigation and proceeding, including attorney's fees, travel costs, and moving expenses;

c.      Lost earning potential to earn a market-rate salary as an attorney following graduation from the University after the spring 2021semester, as reflected in the job offer that Plaintiff was unable to accept; and

d.      Substantial, ongoing emotional distress and anguish occasioned by the unjust treatment to which Plaintiff was subjected, as well as the ongoing harm to her reputation that such treatment has caused.

## FIRST CLAIM FOR RELIEF

### VIOLATIONS OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
### (42 U.S.C. § 2000d *et seq.*)

80.     Plaintiff hereby incorporates all other allegations in this Complaint as though fully recited herein.

81.     Defendant Washington University is a private educational institution that receives federal funding.

82.     Plaintiff is a member of a protected class, as an individual who is of Egyptian and Arab ethnic heritage and whose Muslim faith functions as a proxy for that heritage.

83.     Washington University and its employees and/or agents took adverse actions against Plaintiff; including, but not limited to, initiating an investigation based on allegations of academic dishonesty only after learning of Plaintiff's true identity, then levying severe and life-altering sanctions against Plaintiff despite the lack of any compelling evidence of wrongdoing.

84.     Washington University and its employees and/or agents treated Plaintiff in a discriminatory manner relative to other, similarly situated students who were not members of a protected class.  Such similarly situated students include, but are not limited to, Student No. 6298 and the sixteen students referenced previously in this Complaint who were subjected to similar allegations of misconduct but received less severe sanctions than did Plaintiff.

85.     The treatment to which Washington University subjected Plaintiff was similar to the treatment to which Washington University previously and wrongfully subjected other members of Plaintiff's protected class.

86.     Plaintiff's race, color and/or national origin were the motive for Washington University's discriminatory conduct.

87.     Washington University's acts, conduct, and behavior have denied Plaintiff her rights under Title XI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*, by reason of which she is entitled to injunctive relief requiring the University to remove from her student records any and all record of and references to allegations and findings of, and subsequent sanctions for, cheating and plagiarism by Plaintiff.

88.     As a result of Washington University's conduct, Plaintiff has suffered damages in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial.

## SECOND CLAIM FOR RELIEF

### BREACH OF CONTRACT

89.     Plaintiff hereby incorporates all other allegations in this Complaint as though fully recited herein.

90.     When Plaintiff enrolled in Washington University School of Law, she and Washington University entered into a contractual relationship.  The contract between the parties consisted of, *inter alia*, brochures, policy manuals and other advertisements provided to Plaintiff by Washington University.

91.     As relevant here, the terms of the contract contemplated Plaintiff's enrollment in a course of study that would lead to the conferment of a law degree, in exchange for tuition payments.  The contract also included the Honor Code, with which both Plaintiff and Washington University were required to comply.

92.     The contract between the parties likewise included an implied covenant of good faith and fair dealing, under which Washington University was not permitted to exercise a

judgment conferred by the express terms of the agreement in a manner that evaded the spirit of the transaction or that denied Plaintiff the expected benefit of the contract.

93.     Washington University, by and through the Investigative Committee, breached its contract with Plaintiff in multiple respects, including, but not limited to, the following:

a.      By failing to make a timely determination whether or not to prosecute Honor Code violations against Plaintiff within 10 days of receiving a referral of Professor Moul's complaint from Dean Walsh on July 3, 2020, in breach of Section III(D)(1);

b.      By failing to provide timely notice of the Investigative Team's disposition of the complaint, in breach of Section III(D)(2);

c.      By issuing a charging document that was vague, speculative, conclusory, and unspecific as to the acts or omissions constituting cheating and actionable plagiarism that Plaintiff, specifically, committed or omitted, in breach of Section III(D)(2)(b)(1).

d.      By denying Plaintiff the opportunity to present key evidence of a pattern of discrimination against female Muslim students in investigatory and disciplinary proceedings pursuant to a time-barred motion *in limine* filed after the pre-hearing conference, in breach of Section IV(B)(1)(d).  Specifically, by granting the time-barred motion *in limine*, the University, acting by and through the Case Presentation Team and Hearing Panel, also prohibited Plaintiff from cross-examining Professor Moul on a material issue probative of whether she was biased against female Muslim students, thus violating her rights to "present evidence" and "to question the other side's witnesses," in breach of Section IV(B)(2)(e).

e.      By essentially presuming, based simply on the face of the documents in question and without consideration of the evidence Plaintiff presented in her defense, that

Plaintiff knowingly and intentionally copied and used work from Student No. 6298's brief; and by subsequently concluding that Plaintiff was unable to adequately explain the supposed similarities in the briefs, which purportedly therefore constituted clear and convincing evidence supporting a finding that she was guilty of cheating and actionable plagiarism.  In so doing, the Case Presentation Team failed to carry its burden of proof to establish the charges against Plaintiff by clear and convincing evidence, in breach of Sections IV(A)(2) and IV(B)(2)(d), and the Hearing Panel likewise failed to base its decisions on the basis of clear and convincing evidence proffered by the Case Presentation Team, in breach of Section IV(B)(3).

94.     In addition to these breaches of the express terms of the contract, the University breached the implied covenant of good faith and fair dealing by not following the due process inherent in the Honor Code's assurance to "promote and secure academic integrity, fairness, equal academic opportunity, and professionalism at the School of Law."

95.     Defendant's breaches of the implied covenant of good faith and fair dealing include the following:

a.     Notwithstanding the University's purported commitment to impartiality embedded in its anonymous grading protocol, the University launched its investigation and prosecution against Plaintiff only after learning her identity as a Muslim-American.

b.     The University did not require Kyle Summerville, a member of the Investigative Team and Case Presentation Team, to recuse himself from either the investigation or the prosecution, despite the conflict of interest that became apparent during his investigational interview of Plaintiff.

c. The University had the advantage of compulsory process to ensure the cooperation of Professor Moul, Student No. 6298, and others, including Plaintiff herself, during the investigation and prosecution. Yet, Plaintiff had no comparable right or remedy when Professor Moul and Student No. 6298 refused to participate in an interview, conducted by counsel, prior to the hearing. Nor did Plaintiff have any recourse when one of the students previously accused or others refused to appear as witnesses at the hearing.

d. The University, acting by and through the Case Presentation Team, undermined the integrity of the hearing when it shared with the Hearing Panel, the day before the hearing, prejudicial, unadmitted evidence in the form of Professor Norwood's opinion about the ultimate question in the case.

96. Plaintiff is entitled to injunctive and declaratory relief requiring Defendant to remove from her student records any and all record of and references to allegations and findings of, and subsequent sanctions for, cheating and plagiarism by Plaintiff, to readmit Plaintiff to the School of Law free from Defendant's breaches of their contract and for an order forbidding Defendant from further perpetuating any subsequent breach.

97. Washington University's breaches of its contractual relationship with Plaintiff have resulted in substantial and ongoing damages to Plaintiff in an amount in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00) to be determined at trial.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all causes of action, claims and issues so triable.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, The Washington University, (i) for general and compensatory in an amount

in excess of SEVENTY-FIVE THOUSAND DOLLARS ($75,000.00); (ii) for punitive damages; (iii) for injunctive and declaratory relief described herein, as the Court deems appropriate, which shall, at the very least, require Defendant to remove from Plaintiff's student records any and all record of and references to allegations and findings of, and subsequent sanctions for, cheating and plagiarism by Plaintiff, to readmit Plaintiff to the School of Law free from Defendant's breaches of their contract, and forbidding Defendant from further perpetuating any subsequent breach.; (iv) for pre- and post-judgment interest as allowed by law; (iv) for reasonable costs and attorney's fees incurred in bringing this action; and (v) for such further legal and equitable relief as this Court deems just and proper.

DATED this 25th day of January, 2021.

Respectfully submitted,

**THE BACH LAW FIRM, LLC**

   */s/ Jason J. Bach*

Jason J. Bach
*Admission Pro Hac Vice pending*
7881 West Charleston Blvd., Suite 165
Las Vegas, Nevada 89117
Telephone: (702) 925-8787
Facsimile: (702) 925-8788
Email:  jbach@bachlawfirm.com
*Attorney for Plaintiff Jane Doe*

25